**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FAUST PRINTING, INC. and FAUST PRINTING, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 02 C 9345 |
| v. | ) ) | Judge Joan B. Gottschall |
| MAN CAPITAL CORP. and MAN ROLAND, INC., et al., | ) ) ) | Magistrate Judge Nan R. Nolan |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants MAN Capital Corp. ("MAN Capital") and MAN Roland, Inc. ("MAN Roland, Inc.") have moved for summary judgment in their favor on Faust Printing, Inc. and Faust Printing's (collectively "Faust") third amended complaint and has also moved to strike Faust's request for a jury trial. Faust, in turn, has cross-moved for summary judgment in its favor. For the reasons set forth below, both defendants' and plaintiffs' motions for summary judgment are denied. MAN Capital's motion to strike Faust's request for a jury trial is granted.

### I. BACKGROUND

The disputes in this case center on the purchase of a printing press by Faust. In 1997, Faust commenced negotiations with MAN Roland for the purchase of a MAN Roland Series 700 press to replace its own moribund printing press. Faust explored several financing options, but in the end elected to arrange financing for the machine with MAN Capital's predecessor in interest, MAN Finance Corp. ("MAN Finance"), a

1

subsidiary corporation of MAN Roland. Faust allegedly decided to finance the press with MAN Finance so that Faust would have financial recourse against MAN Roland should it default on any of the terms of the agreement to purchase, including if the press failed to perform to specifications.

On September 24, 1997, Dan Quenzer ("Quenzer") of MAN Roland introduced Faust President and CEO Donald Faust to Richard Pierzchala ("Pierzchala"), General Manager of Leasing and Financing of MAN Finance. Pierzchala was allegedly introduced as "the guy from MAN Roland's in-house finance department" when in fact Pierzchala was employed by MAN Finance and not by MAN Roland. According to Faust, Pierzchala and other representatives of MAN Finance allegedly assured Faust that financing was being arranged through the same company that manufactured the press, and that Faust would have direct financial recourse against the manufacturer. Indeed, alleges Faust, Pierzchala used language in his faxes and letters to Faust that led him to believe that MAN Roland and MAN Finance were one and the same company.

In consummating the deal, Faust signed two principal contracts, along with assorted riders, schedules and amendments. The first contract (the "Machine Contract" or the "Contract") was signed by Faust and by MAN Roland on January 29, 1998, and addressed the acquisition of a new Series 700 printer to be installed by MAN Roland, as well as the training of Faust employees in its use. The second contract (the Master Lease Agreement" or "Lease") was signed by Faust and by a representative of MAN Finance, and expressed the terms of the proposed financing of the printing press.

The terms of the Machine Contract specified that Faust would receive "one (1) new MAN Roland 700 Series Six Color Offset Press with Coater, Model R706LV." The

press was to be delivered with all standard equipment and several optional accessories for a price of $2,589,317 (less a $225,000 trade-in allowance), as described in an 11-page attached quotation supplied by MAN Roland. Moreover, the Machine Contract specified that it constituted and contained the entire agreement between the parties and that "all prior or contemporaneous understandings or agreements between the parties, if any, whether written or oral or express or implied, are merged into and with th[e] [Machine Contract]."

The Master Lease Agreement was signed by Faust and by Pierzchala on February 26, 1998. The Master Lease Agreement was printed on stationery featuring the MAN Finance Corporation logo with the word "MAN" in large type and the words "Finance Corporation" in smaller type below; the logo is conspicuously similar to MAN Roland's. The Master Lease Agreement stated in its first paragraph that the agreement was "by and between MAN Finance Corporation, a Delaware corporation with a place of business located at 17 State Street, New York, New York 10004 ("Lessor") and Faust Printing…." The lease continues on to disclaim any warranties by MAN Finance concerning the performance of the press.[1] Moreover, the lease also contained a so-called "Hell or high water" clause, specifying that Faust's responsibility for meeting the payment schedule

---

[1] Paragraph 6 of the Master Lease Agreement reads as follows:
DISCLAIMER OF WARRANTIES: LESSOR, NOT BEING THE MANUFACTURER OF THE EQUIPMENT,NOR THE MANUFACTURER'S AGENT, IS NOT REQUIRED TO NOR MAKES ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, AS TO FITNESS, QUALITY, DESIGN, CONDITION, CAPACITY, SUITABILITY, MERCHANTABILITY, USE, OPERATION, OR PERFORMANCE, OR THE DELIVERY, SERVICING, MAINTENANCE, OR REPAIR, OF ANY EQUIPMENT, OR OF THE MATERIAL OR WORKMANSHIP THEREOF, IT BEING AGREED THAT ALL EQUIPMENT IS BEING LEASED "AS IS" AND THAT ALL SUCH RISKS, AS BETWEEN LESSOR AND LESSEE, ARE TO BE BORNE BY LESSEE AT ITS SOLE RISK AND EXPENSE. LESSEE ACCORDINGLY AGREES NOT TO ASSERT ANY CLAIM WHATSOEVER AGAINST LESSOR BASED THEREON.
(capitals in original).

3

was unconditional and not subject to any abatement, deferment, or interruption for any reason.[2] The Lease also stated that the total or partial loss of use or possession would not relieve Faust of its responsibility to make payments, nor would repossession of the press by MAN, in the event Faust should default on its payments relieve, Faust of its payment obligations.

On the signature page of this Faustian contract are the signatures of Donald Faust as President and CEO of Faust as lessee, and Pierzchala as representative of MAN Roland (not MAN Finance) as the lessor. This was, according to MAN Finance, merely a typographical error that was allegedly remedied when a new substitute page, listing MAN Finance as the lessor, was signed by both parties shortly thereafter. MAN Finance alleges that it communicated directly and explicitly to Faust the nature of the correction; Faust maintains only that it was told that certain words had been "misspelled."

MAN Capital asserts that because there was a need for haste in installing the new press, Faust was told that it would not receive a machine especially manufactured for it but would receive instead an "inventory machine", i.e., one that had been previously contracted for by another MAN Roland customer, Litho Industries ("Litho"). Faust disputes MAN Roland's assertion that it was ever informed that it was not receiving a new, custom built machine. According to Faust, Quenzer recognized this particular press as one "custom manufactured for another customer" that failed to meet the specifications

---

[2] Paragraph 11(a) of the Master Lease Agreement states in part that:
Except as otherwise specifically provided for herein or in any Schedule hereto, each Lease is irrevocable for the full term thereof and Lessee's obligation to pay all Rent and all other amounts due or to become due and its obligations to perform its other agreements thereunder are absolute and unconditional, shall not be subject to any abatement, reduction, set-off, counterclaim, recoupment, defense, deferment, or interruption for any reason whatsoever, and shall survive the expiration of termination hereof to the extent required for their complete performance.

4

of the machine for which Faust had contracted. MAN contends that this press had never been used and was, essentially, "brand new out of the box." Faust further alleges that, during the installation of the press in Faust's facility, an unnamed MAN Roland employee tampered with the press' identification plate, altering the year of manufacture from 1996 to 1998, an alteration that Faust did not discover until the press was repossessed in 2002.

Faust maintains that the installed press lacked the advanced features of the press it had contracted for, but that it was compelled by MAN Roland to sign a "certificate of acceptance" under threat that MAN Roland would lock off the power supply, rendering the press nonoperational. The press was duly installed in Faust's printing facility on September 2, 1998. According to Faust, the completely installed press was unsatisfactory, prone to mechanical difficulties and breakdowns, and produced poor quality prints. As a result, Faust alleges it lost customers and substantial revenue and was ultimately unable to meet the payment schedule prescribed in the Master Lease Agreement. Consequently MAN Capital (MAN Finance's successor in interest) filed suit against Faust to repossess the press, which it did in 2002. Faust subsequently filed the instant suit, claiming fraudulent inducement to enter the Machine Contract against MAN Roland (Count I); fraudulent inducement to enter into the Master Lease Agreement against MAN Roland and MAN Capital (Count II); and alter ego liability against MAN Roland and MAN Capital (Count III).[3] MAN Roland and MAN Capital filed a counterclaim alleging breach of contract by Faust. Presently before the court are both

---

[3] A fourth claim against MAN Aktiengesellschaft, the German parent organization of MAN Roland and MAN Capital, was dismissed for lack of personal jurisdiction.

parties' motions for summary judgment and defendant's motion to strike Faust's demand for a jury trial.

## II. ANALYSIS

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant for summary judgment bears the burden of establishing that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof at trial, then Rule 56(c) mandates a grant of summary judgment. *Celotex*, 477 U.S. at 322-23. When considering a motion for summary judgment, the court will consider the evidentiary record in the light most favorable to the nonmoving party and will draw all reasonable inferences in its favor. *Lesch v. Crown Cork & Seal Co.,* 282 F.3d 467, 471 (7th Cir. 2002).

A. <u>Faust's claim that MAN Capital Fraudulently Induced it to Enter into the Master Lease Agreement.</u>

Faust's claim that MAN Capital fraudulently induced it to enter into the Master Lease Agreement is predicated on two principal allegations: (1) that MAN Roland and MAN Capital fraudulently misrepresented to Faust that they were the same company, and that MAN Capital provided "in-house" financing for MAN Roland; (2) that MAN Capital and MAN Roland conspired to mislead Faust into believing that it was dealing only with the manufacturer in structuring the purchase agreements by fraudulently switching the signature pages of the Master Lease Agreement. By this alleged ploy, Man Capital led

Faust to believe that it was signing a financing agreement with MAN Roland, the manufacturer of the press.

Both sides concede that Illinois law controls this dispute. In Illinois, fraudulent inducement requires proof of five elements: (1) a false statement of material fact; (2) the statement is known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (quoting *Cotter v. Parrish*, 520 N.E.2d 1172, 1175 (Ill. App. Ct. 1988)). Moreover, concealment of an existing material fact and/or silence, accompanied by deceptive conduct or suppression of material facts, amounts to fraudulent misrepresentation. *Munjal v. Baird & Warner, Inc.*, 485 N.E.2d 855, 862-63 (Ill. App. Ct. 1985).

In their motion for summary judgment, MAN Capital and MAN Roland attack Faust's complaint on the fourth and fifth elements, asserting that (i) Faust could not have reasonably relied upon MAN Capital's alleged representation; and (ii) that Faust was not damaged by MAN Capital's alleged fraud.

MAN Capital and MAN Roland contend that Faust could not have reasonably relied on any representation made by the defendants that MAN Roland and MAN Capital were the same company (and thus suggesting that Faust would have financial recourse against the defendants if the press failed to perform) because any such representation conflicts squarely with the explicit language of the lease. Illinois courts have long recognized that "a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he is

afforded the opportunity of knowing the truth ... he cannot be heard to say he was deceived by misrepresentations." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 882 (7th Cir.2005) (quoting *Schmidt v. Landfield*, 169 N.E.2d 229, 232 (Ill. 1960)); see also *Miller v. William Chevrolet/GEO, Inc.,* 762 N.E.2d 1, 9 (Ill. App. Ct. 2001). More specifically, Illinois courts have consistently refused to extend the doctrine of fraudulent inducement to vitiate contracts where the complaining party could have discovered the fraud by reading the instrument and had the opportunity to do so; this is the so-called "due-diligence" rule. *Kolson v. Vembu*, 869 F.Supp. 1315, 1322 (N.D. Ill. 1994); *Davis*, 396 F.3d at 882.

MAN Capital argues that the language of the Master Lease Agreement alone controls because it is unambiguous and explicit that the obligation to make payments was absolute and unconditional and not subject to any defenses, abatements, or set-offs due to non-performance. Therefore, according to MAN Capital, any other representations made to Faust outside of the four corners of the Lease are irrelevant. Likewise, the "Hell or high water clause" of the Master Lease Agreement allegedly obligated Faust to payment for the full term of the Lease, regardless of any other circumstances or representations. MAN Capital points to the same non-recourse language in the Machinery Contract to prove that Faust can hardly have been ignorant of this provision in both agreements. Therefore, according to MAN Capital, given the clear and unambiguous language of the contracts, Faust could not have reasonably believed that it would have recourse against MAN Finance should the press fail to function to its specifications, and Faust remained obligated to make the payments required by the Master Lease Agreement.

MAN Capital also argues that Paragraph 22(e) of the Master Lease Agreement provides that the "Lessor may sell, assign, transfer, grant security interests in, or otherwise dispose of any or all of its interests in or rights under this Agreement or any Schedule hereto (sic), together with its obligations, and Lessee hereby consents to the same." MAN Capital contends that even had Faust believed it was entering into the Master Lease Agreement with the manufacturer of the press, that lease was still assignable by MAN Capital at any time.

Faust counters with the contention that, under Illinois law, contractual terms are to be viewed in context, and the contract must be considered as a whole in order to ascertain the parties' intent. *See Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 687 (7th Cir. 2004). Faust argues that if the language of the Master Lease Agreement is ambiguous, then as a matter of law it must be construed against the drafter and extrinsic representations may be considered by the court. *Bourke v. Dun & Bradstreet Co.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (citing *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 368 (Ill. 1998). The question, then, is whether the language of the contract is ambiguous upon the subject of Faust's obligations to pay without recourse.

The language in the "Hell or high water clause" quoted in footnote 2 *supra* is contained within a clause (Clause 4) entitled "Net Lease" and is preceded by a brief sentence stating that: "Each Lease shall be a net lease." A net lease is one which generally puts the burdens of ownership on the lessee, who pays all taxes and operating expenses on the property so that the owner receives a fixed or "net" rental. *Chicago City Bank & Trust Co. v. Ceres Terminals, Inc.* 417 N.E.2d 798, 805 (Ill. App. Ct. 1981). Faust argues that because the clause was preceded by the "net lease" declaration, a plain

9

reading of the clause's language is that Faust was not yielding *all* rights of recourse against MAN Capital (or MAN Roland), but rather that it was not entitled to set off against the rental payments the amounts that Faust was going to have to pay for the taxes, insurance and similar payments the Lease required Faust to make. Moreover, Faust claims that the language of the second sentence of the clause reading, "Except as otherwise specifically provided for herein or in any Schedule hereto…," qualifies the "absolute nature of the subsequent text." Faust then points to clause 11(b) of the Master Lease Agreement which provides in part that:

> In the event of any damage to the Equipment or any other loss, lessee shall immediately give notice of such damage or loss to the Lessor, and to the insurers that have insured against such risks and Lessor shall have the option, exercised in its sole discretion, to either repair or replace the equipment or declare the lease to be terminated.

Faust asserts that the 11(b) language indicates a willingness by the lessor to stand by the machine and financial recourse against the lessor should the press fail to perform to specification.

Faust counters the defendant's argument concerning the assignability of the Master Lease Agreement by pointing out that the language of Clause 22(e) states that the right to transfer or assign the Lease carries with it the obligations of the Lessor, and it contends that those obligations include the responsibilities of the Lessor to ensure that the press functioned as specified.

When the court considers a motion for summary judgment, it considers the evidentiary record in the light most favorable to the nonmoving party. *Lesch,* 282 F.3d at 471. Looking at the language of the contract in a light most favorable to Faust, its interpretation of the language of the contract could be reasonably construed as supporting

10

its interpretation of the terms contested here, as opposed to the construction championed by MAN Capital and MAN Roland. The "net lease language" of Clause 4 of the Lease could be reasonably construed to support Faust's meaning, i.e., that Faust was obligated for all additional required payments (as in a net lease) that the Lease required it to make.

Likewise Faust's interpretation of Clause 11(e) is not unreasonable. The language of the clause (omitted in defendant's motion brief) states that the obligations of the Lessor transfer with the Lease in addition the rights conferred by it. Thus, if Faust believed that MAN Roland and MAN Capital were, as the same company, financially responsible for the proper functioning of the press, then any transfer of the lease would require the transferee to assume the same obligation. The court cannot say whether such interpretations of the contractual language will prevail at trial, but that is not the standard required to survive a motion for summary judgment.

Looking at the facts in the light most favorable to Faust, therefore, there are alternate reasonable interpretations of the Master Lease Agreement, and an ambiguity can therefore be said to exist. A contract term is ambiguous only if the language used is reasonably and fairly susceptible to more than one meaning. *Lenzi v. Morkin*, 452 N.E.2d 667, 669 (Ill. App. Ct. 1983, (citing *Chicago Investment Corp. v. Dolins*, 418 N.E.2d 59, 62 (Ill. App. Ct. 1981). When such an ambiguity exists within the four corners of the contract, extrinsic evidence may be admitted. *Lenzi*, 452 N.E.2d at 669. The question of whether a contract is ambiguous is entirely a matter of law to be determined by the court. *Id*.

Therefore, Faust's recitation of the alleged representations made to it concerning the relationship between MAN Capital and MAN Roland may be considered. The court

must view the statements made by Pierzchala that MAN Capital was "in-house financing," and that MAN Capital was a part of MAN Roland, as well as the signature block on the original version of the Master Lease Agreement stating that the signatory (Pierzchala) represented MAN Roland in the light most favorable to Faust. Doing so, the court finds that the fourth element of fraudulent inducement is met, *viz.*, that Faust acted reasonably in reliance on the truth of the statements made by MAN Capital.

Since there is thus a genuine issue of material fact concerning whether Faust reasonably relied upon MAN Capital's representations concerning the Master Lease Agreement, defendants' argument fails on this point.

Defendants next argue that Faust has failed to establish that there is any genuine issue of material fact supporting the fifth element of fraudulent inducement, i.e., that Faust was not damaged by MAN Capital's alleged fraud. MAN Capital argues that Faust is no worse off having entered into the Lease with it than it would have been if it entered into a similar contract with MAN Roland, as Faust believed it was. Defendants claim that regardless of the signatory on the Master Lease Agreement, any performance problems with the press would not act as a defense to Faust's obligations to make the payments scheduled with the Lease, an obligation that was irrevocable under the explicit terms of the Lease. Thus, according the defendants, it makes no difference whatever whether it was MAN Capital or MAN Roland who was the signatory to the Master Lease Agreement.

Furthermore, the Master Lease Agreement also contains a clause ("Clause 18") which contains an express provision immunizing MAN Capital against any action by Faust for loss of anticipatory profits or consequential damages. Therefore, according to

MAN, this action cannot be brought by Faust under the terms of the Master Lease Agreement.[4]

Faust claims in turn that because it was fraudulently induced to enter the contract, believing (based on MAN Capital's allegedly fraudulent representations) that through the Lease it would have financial recourse against MAN Roland. Under Illinois law, a contract that is fraudulently induced is voidable by the innocent obligor. *Tower Investors LLC v. 111 East Chestnut Consultants, Inc.*, 864 N.E.2d 927, 939 (Ill. Appt. Ct. 2007) (citing *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.,* 821 N.E.2d 706, 712-13 (Ill. Appt. Ct. 2004)). Moreover, Faust claims that Clause 18a of the Master Lease Agreement is inapplicable, because it addresses not breach of contract, but, rather, default by the Lessor, i.e., if MAN Capital had failed to lease the equipment to Faust.

Under Illinois law, consequential damages such as lost profits may be limited or excluded by parties to a contract unless the limitation or exclusion is unconscionable. 810 ILCS 5/2-719(3); *CogniTest Corp. v. Riverside Pub. Co.*, 107 F.3d 493, 496 (7th Cir. 1997). However, Faust's claim that it was fraudulently induced into the Master Lease Agreement is predicated on the genuine issues of material fact described above. If it was so induced, then the contract may be voidable by Faust. Again, there is a genuine issue

---

[4] The language of Clause 18 reads in part:
Upon the event of a Lessor Event of Default, Lessee, at its option, may (i) cancel the lease and recover so much of the Rent previously paid by it or (ii) commence an action for specific performance against Lessor. NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN A LEASE TO THE CONTRARY, IN NO EVENT SHALL LESSEE, REGARDLESS OF CAUSE, ASSERT ANY CLAIM WHATSOEVER AGAINST LESSOR FOR LOSS OF ANTICIPATORY PROFITS OR CONSEQUENTIAL DAMAGES. THIS SUBSECTION (a) CONSTITUTING THE EXCLUSIVE REMEDIES OF LESSEE AND LESSOR'S SOLE REPONSIBILITY AND LIABILITY TO LESSEE HEREUNDER.
(capitalization in original).

of material fact that is contested by the parties, and MAN Capital's motion for summary judgment is consequently denied.

B. <u>Faust's claim that MAN Roland Fraudulently Induced it to Enter into the Machinery Contract.</u>

Defendant MAN Roland, which entered into the Machinery Contract with Faust, disputes Faust's contention that it fraudulently induced Faust to enter into the Contract. The principal dispute between MAN Roland and Faust centers upon the nature of the Series 700 press that was the object of the Contract. Specifically, the language of the Machinery Contract specifies delivery of: "One (1) New MAN Roland Series 700 Six Color Offset Press with Coater, Model R706 LV complete with standard equipment and optional accessories as described in attached quotation # WDQ10322.2 dated January 22, 1998." MAN Roland contends that, because of time pressures, the press that was delivered to Faust was an "inventory press," i.e., one that had been manufactured for another client, Litho, Inc., ("Litho") in 1996, but which had been sold instead to Faust. MAN Roland insists that the press delivered to Faust, although manufactured for Litho, and with Litho's name imprinted on the operator's manuals, was "new out of the box." Moreover, MAN Roland contends that the Contract never specified that the press be manufactured in 1998, merely that the press be "new."

Faust asserts that, far from being new, the press was sold to, and returned by, Litho, that it lacked components and upgrades that would have been present in a 1998 model, and hence performed less well. Faust also alleges that an unnamed MAN Roland operative attempted to conceal the age of the machine by altering the date stamped onto the press' registration plate.

In sum, the dispute centers on what is the definition of a "new" press and the expectations that the parties had (or were led to believe) at the formation of the contract. Faust believes that it was entitled to a newly-manufactured 1998 press, and that MAN Roland attempted to conceal the actual age of the machine. MAN Roland contends that the 1996 inventory press was to all intents and purposes "new," and that it in no way attempted to mislead or fraudulently induced Faust to contract for anything less than what Faust actually received. Since this reflects a dispute over a genuine issue of material fact, MAN Roalnd's motion for summary judgment is denied.

C. Faust's Motion for Summary Judgment of Defendants' Counter-Claim Alleging Breach of Contract.

MAN Roland and MAN's counter-claim for breach of contract against the defendant's is based on the nature and performance of the same Series 700 press. Faust alleges that defendants breached the Machinery Contract and the Master Lease Agreement by providing a press that was not "new" but had been manufactured for Litho and retained in inventory. Moreover, alleges Faust, the machine did not perform to the specifications recited in the Contract. Defendants MAN Capital and MAN Roland, dispute these allegations, claiming that the machine was not used prior to its acquisition by Faust and that the machine met its specified performance requirements, if not continuously. As summarized in the previous section, this represents a dispute over genuine issues of material fact sufficient to defeat Faust's motion for summary judgment.

D. Defendants' Motion to Strike Faust's Request for a Jury Trial.

Man Capital and MAN Roland have moved to strike Faust's request for a jury trial based upon the language of Clause 22(k) of the Master Lease Agreement ("Clause 22(k)"). Clause 22(k) reads:

> (k) <u>Waiver of Jury Trial.</u> THE PARTIES HEREBY KNOWINGLY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION LITIGATED IN ANY COURT BASED UPON, WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR ANY SCHEDULE HERETO AND ANY AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT. (capitals in original).

Clause 22(k) is the final clause of the Lease and is printed in bold face type directly above the parties' signatures.

Faust argues that because the contract was fraudulently induced, the terms of the contract are therefore irrelevant to the issue of this case. Faust contends, without citing any authority to support its contention, that the clause applies only to claims "based upon, with respect to, in connection with, or arising out of this agreement" and that the alleged fraudulent inducement of the contract does not fall into any of these categories.

The court disagrees. Illinois courts and federal courts applying Illinois law have held that similarly-word jury trial waivers and comparable contract clauses apply to claims of fraudulent inducement in addition to contract claims. *See, e.g., Konewko v. Kidder, Peabody & Co.,* 528 N.E.2d 1, 5 (Ill. App. Ct..1988), ("[a]ny controversy or claim arising out of or relating to accounts of ... the undersigned or to this agreement [sic] or the breach thereof shall be settled by arbitration" required that fraudulent inducement claim be arbitrated); *Matthews v. Rollins Hudig Hall Co. ,* 72 F.3d 50, 54 (7th Cir. 1995)

16

(in arbitration provision, "relating to a breach of th[e] Agreement" encompassed fraudulent inducement claim); *Jannotta v. Subway Sandwich Shops, Inc.*, No. 94 C 3834, 1999 WL 184396, at *2-3 (N.D. Ill. March 29, 1999) (attorneys' fees provision in contract applicable to claims of fraudulent inducement); (*C.F.M.I., Inc. v. Felish,* No. 96 C 3547, 1996 WL 745347, at *4 (N.D. Ill. Dec. 24, 1996) (in arbitration provision, fraud in the inducement claim "certainly" was a "dispute between the parties ... in relation to this Agreement"). The language of Clause 22(k): "based upon, with respect to, in connection with, or arising out of this agreement" is sufficiently broad by this standard to be applicable to the fraudulent inducement claim brought by Faust.

Faust also argues that it did not voluntarily and knowingly agree to the jury trial waiver and that it is therefore unenforceable. There is a general presumption against enforcing such waivers, and thus a waiver of the right to a jury trial must be made knowingly and voluntarily. *Heller Financial Leasing, Inc. v. Gordon*, No. 03 C 6326, 2004 WL 2806458, at *6 (N.D. Ill. Dec. 3, 2004). Four factors are analyzed to determine whether this test is met: (1) the parties' negotiations concerning the waiver provision, if any, (2) the conspicuousness of the provision, (3) the relative bargaining power of the parties and (4) whether the waiving party's counsel had an opportunity to review the agreement. *Whirlpool Financial Corp. v. Sevaux*, 866 F. Supp. 1102, 1105 (N.D. Ill. 1994). Not all of these factors need be satisfied; rather, the court must balance the various factors. *IFC Credit Corp. v. United Business & Indust. Federal Credit Union*, 474 F. Supp. 2d 945, 954 (N.D.Ill. 2006).

In the instant case, neither side claims that there was any negotiation with respect to Clause 22(k), although MAN Capital alleges that other portions of the lease were

negotiated and that MAN Capital altered two provisions of the Lease during these negotiations. No evidence is adduced by Faust that it was precluded from, or unable to, negotiate this specific clause, other than that it was told that the contract was "standard boilerplate." This factor might weigh in Faust's favor since the absence of specific discussions or negotiations concerning a contractual jury trial waiver weigh in favor of it being unenforceable. *See In re Reggie Packing Co.*, 671 F. Supp. 571, 573 (N.D. Ill 1987). Clause 22(k), as noted above, is certainly conspicuous; it is the final paragraph in a seven-page lease agreement, in capitalized, bold-faced print located directly above the signatures of the parties. Moreover, even if the location was less conspicuous, it is only in extreme cases that the courts invalidate a waiver clause due to its inconspicuous location in a contract. *In re Reggie*, 671 F. Supp. at 573. The parties in the instant were established businesses, with knowledge of business procedures and contracts, engaged in a protracted, arm's length transaction (Faust had allegedly investigated and negotiated with other printing press manufacturers). There is no evidence to suggest that Faust's attorney reviewed the contract before it was signed but, conversely, there is no evidence to suggest that Faust could not or did not have the opportunity to have an attorney review the contract. Moreover, prior review of a contract by an attorney is not required to render a waiver of jury trial provision enforceable. *Tradewinds Aviation, Inc. v. Jet Support Services, Inc.*, 04 C 1406, 2004 WL 2533728, at *5 (N.D. Ill. September 28, 2004). Under this analysis, the balance of factors favors enforcing Clause 22(k) and granting MAN Capital's motion to strike Faust's request for a jury trial.

## III. CONCLUSION

For the reasons specified above, MAN Capital's and MAN Roland's motions for summary judgment are denied. Faust's motion for summary judgment is also denied. Finally, MAN Capital's motion to strike Faust's request for a jury trial is granted.

ENTER:

                                                /s/
                                     JOAN B. GOTTSCHALL
                                     United States District Judge

DATED: December 14, 2007