UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FAUST PRINTING, INC.<br>and FAUST PRINTING,<br><br>        Plaintiffs,<br>  v.<br><br>MAN CAPITAL CORP.,<br>MAN ROLAND INC., *et al.*,<br><br>        Defendants. | Case No. 02 C 9345<br><br>Judge Joan B. Gottschall |

## **MEMORANDUM OPINION & ORDER**

Plaintiffs Faust Printing Inc. and Faust Printing (collectively, "Faust") brought this fraud action against defendants MAN Capital Corp. and MAN Roland, Inc. related to Faust's purchase of a MAN Roland series 700 printing press. This matter is presently before the court on defendants' motion for summary judgment. For the reasons stated herein, the court grants defendants' motion in part.

### I. BACKGROUND

In approximately September 1997, Faust entered into negotiations to purchase a MAN Roland series 700 printing press. (Compl. ¶ 15.) Those negotiations culminated in the January 29, 1998 execution of a Machinery Contract by Faust and MAN Roland. (Pls.' Resp. to Defs.' Stmt. of Facts ¶ 3 & Ex. K.)[1] The Machinery Contract incorporates performance criteria set forth in a document captioned Addendum A. (*Id.* ¶ 4 & Ex. K.) Faust also executed a Master Lease Agreement on February 24, 1998 through which it

---

[1] It is undisputed that MAN Roland and Faust executed the Machinery Contract on January 29, 1998, although the Machinery Contract is dated January 22, 1998. (Pl.'s Resp. to Defs.' Stmt. of Facts ¶ 3 & Ex. K.)

financed the purchase of the press. (*Id.* Ex. F.) A representative of MAN Roland executed the Master Lease Agreement on February 26, 1998 (*id.*); subsequently, Faust and a representative for MAN Capital's predecessor-in-interest, MAN Finance Corporation, executed an additional signature page to the Master Lease Agreement which was identical save for the signature blocks. (*See id.* Ex. G.)

The press Faust received (the "Press") did not function as Faust expected, and Faust now seeks redress by means of this fraud action. In Count I, Faust claims that MAN Roland fraudulently induced it to enter into the Machinery Contract, and in Count II, Faust alleges that MAN Capital and MAN Roland fraudulently induced it to enter into the Master Lease Agreement. In Count III, Faust seeks to hold both MAN Roland and MAN Capital liable under an alter ego theory.

Defendants' motion for summary judgment focuses on whether genuine issues of material fact exist regarding: whether, at the time of execution of the Machinery Contract, the Press could not meet the performance criteria set forth in Addendum A (and whether MAN Roland knew as much); whether Faust suffered any damage from MAN Roland's alleged misrepresentation regarding the date of manufacture of the Press; and whether Faust's agreement to the "hell or high water" clause in the Master Lease Agreement precludes its fraudulent inducement claim.

## II. MATERIAL FACTS

The facts stated within are undisputed (or, where baselessly disputed, without genuine issue) unless otherwise noted.

**A. Performance**

In the Machinery Contract, the parties specified that the Press was to be a "New MAN Roland Series 700 Six Color Offset Press with Coater, Model R706 LV complete with standard equipment and optional accessories . . . . See Addendum A . . . forming part of this contract." (*See id.* Ex. K.)[2] Addendum A sets forth various performance criteria for the Press regarding: the testing of the Press, the "make-ready" time for a normal Press commercial job; MAN Roland service technician response to emergencies; the computer system accompanying the Press; and various other technical requirements. (*See* Pls.' Resp. to Defs.' Stmt. of Facts Ex. K, at 3.) Faust eventually received a Series 722 Press which was manufactured in 1996. (*See id.* Ex. M ¶¶ 3-4.)

Don Faust, President and CEO of Faust,[3] testified regarding the operation of the Press, particularly in comparison to the specifications in Addendum A. (*See generally* Defs.' Stmt. of Facts Ex. 11.) Going through the specifications in Addendum A, Don Faust testified that the Press: was properly tested; "very, very rare[ly]" performed jobs in the specified amount of time; "was not consistent" in density control; did not "have major problems" with marking; and would "sometimes" print commercially acceptable solids. (*See id.* 86-94.) He also testified that MAN Roland "rarely . . . had the correct technician on the site within four hours." (*See id.* 96.) In sum, Don Faust attested that the Press and MAN Roland satisfied six of the eight requirements set forth in Addendum A at *some*

---

[2] The validity of the Machinery Contract is disputed, but there is no dispute that the parties executed the Machinery Contract.
[3] For distinction, the court refers to Don Faust by his full name or by "he," while references to Faust, as previously designated, refer to plaintiffs.

3

point during Faust's use of the Press, although not necessarily simultaneously.[4]  Don Faust also testified that he did not know whether MAN Roland, at the time it executed the Machinery Contract, intended to provide Faust with a press that would not satisfy the criteria set forth in Addendum A.  (*See id.* ¶ 12, at 155.)

Faust offered Donald E. Lewis, a former service technician at MAN Roland, as an expert regarding differences in the types of presses manufactured by MAN Roland.  (*Id.* ¶ 5.)  Before asking Lewis questions regarding the performance of MAN Roland presses, counsel made clear he was asking about presses generally, and not the Press specifically:

> Q. . . . And again, I am going to ask you this about the press series in general, not about Faust's press in particular.
>
> . . .
>
> If we are going to get into an area where I am going to ask you a specific question about Faust's press in particular, I'll let you know.

(*See id.*, Ex. 10, at 116.)  Thereafter, Lewis conceded that the series 722 press *generally* would meet each of the technical specifications described in the Addendum A, without attesting to the ability of the Press to meet those specifications.  (*See* Defs.' Stmt. of Facts Ex. 10, at 116-39.)

Faust produced testimonial and documentary evidence that it lost customers because of the faulty operation of the Press, although that evidence is undermined by Faust's tax returns, which indicate that Faust enjoyed increasing revenues throughout the relevant periods.  (*See* Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 42.)

---

[4]  Although defendants claim that Faust admitted that "the Press was, at times, able to satisfy each of the performance criteria," they point to no evidence that Faust testified that the Press conformed with Addendum A's requirements regarding hickeys or computer systems.  (*See generally* Defs.' Stmt. of Facts Ex. 11; *see also* Pls.' Resp. to Defs.' Stmt. of Facts Ex. K.)

### B. The "New" Press

As quoted above, the Machinery Contract states that the Press was to be "New." Faust maintains that defendants fraudulently induced it to enter the Machinery Contract by promising a "new" Press with no intention of providing a Press that was new. (*See* Compl. ¶¶ 15, 21-22.) Defendants contend that they are entitled to judgment as a matter of law on Count I because there is no difference in value between the 1996-manufactured Press that Faust actually received and a new 1998-manufactured series 727 press, to which Faust contends that it was entitled. Lewis, Faust's expert, opined in his written report that "[t]he value of a 1996 Roland 700, as compared to a 1998 Roland 700, is significantly less." (*See* Pls.' Resp. to Defs.' Stmt. of Facts ¶ 6 & Ex. C ¶ 2(d).) Lewis also testified that the series 722 Press that Faust actually received is less valuable than the series 727 press to which Faust and Lewis contend Faust was entitled, due to several upgrades from the 722 series press to the 727 series press. (*See id.* Ex. D, at 44-52.) Lewis later testified that he did not perform an actual valuation of the two presses, but instead determined that the series 727 press was newer and therefore more valuable than the series 722 Press, and that the newer model had "some substantial upgrades and modifications." (*See id.* ¶¶ 7-8; *see also* Defs.' Stmt. of Facts Ex. 9, at 115:12-14.)

### C. The Master Lease Agreement

In Count II of the Complaint, Faust alleges that it was fraudulently induced to enter the Master Lease Agreement with MAN Capital's predecessor in interest, MAN Finance. (*See generally* Compl. ¶¶ 35-36.) The nature of the fraud, according to Faust, was that MAN Roland represented that Faust would have recourse against it in the event of problems with the Press, but that a MAN Roland representative sent Don Faust a

substituted signature page for Faust to sign in which MAN Finance took the place of MAN Roland, thereby eliminating Faust's recourse. (*See id.*; *see also* Pls.' Resp. to Defs.' Stmt. of Facts Exs. F & G.) Although not at issue in the instant motion, there was substantial confusion before the execution of the Master Lease Agreement as to the identity of Faust's counter-party. (*See* Defs.' Resp. to Pls.' Stmt. of Add'l Facts ¶ 47 & Ex. O at 97, 111-12; *see also* Ex. T; *see also* Pls.' Resp. to Defs.' Stmt. of Facts Exs. F, G, H, R, S & GG.)

The issue here is the effect to be given the Master Lease Agreement. The relevant portions of the Master Lease Agreement state as follows:

> **4. NET LEASE:** Each Lease shall be a net lease. Except as otherwise specifically provided herein or in any Schedule hereto, each Lease is irrevocable for the full term thereof and Lessee's obligation to pay all Rent and all other amounts due or to become due and its obligations to perform its other agreements thereunder are absolute and unconditional, shall not be subject to any abatement, reduction, set-off, counterclaim, recoupment, defense, deferment, or interruption for any reason whatsoever, and shall survive the expiration or termination hereof to the extent required for their complete performance.

(Pls.' Resp. to Defs.' Stmt. of Facts, Ex. F ¶ 4 (emphasis in original).) David Rabinovitz, Faust's leasing expert, testified that paragraph 4 is a "hell or high water" clause that obligates the lessee to pay regardless of the performance of the Press. (*Id.* Ex. B, at 111.) However, Rabinovitz also testified that "it's my opinion that the lessor and the manufacturer or the supplier of the equipment are one and the same." (*Id.*) Rabinovitz then testified that, while the "hell or high water" clause is effective where the lessor and manufacturer are distinct entities, "if, in fact, the lessor is either the manufacturer or the manufacturer's agent, then I would think that this whole disclaimer [*i.e.*, the "hell or high water" clause] falls out the window." (*Id.* 117; *see also id.* 118 (stating that, "If, in fact,

6

[the lessor is] the supplier or the manufacturer, it starts to knock the legs out of the hell or high water stool.").)

### III. LEGAL STANDARD

Summary judgment is warranted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). Normal burdens of proof remain, however. If a plaintiff has failed to establish one of the elements of his case and there is no factual dispute regarding that element, then summary judgment will be entered in favor of the defendant. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006); *see also Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 892 (7th Cir. 2005) ("Summary judgment for a defendant is appropriate when a plaintiff fails to make a sufficient showing to establish the existence of an element essential to [his] case on which she will bear the burden of proof at trial.") (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citations and alterations omitted)).

### IV. ANALYSIS

MAN Roland and MAN Capital seek summary judgment on all counts.

**A.   Fraudulent Inducement**

The parties agree that Illinois law controls Faust's fraudulent inducement claims. The Seventh Circuit has summarized the Illinois fraudulent inducement standard as follows:

7

In Illinois, fraudulent inducement requires proof of five elements: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance."

*Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (internal citations omitted). Silence alone cannot stand in place of a "statement," but "silence accompanied by deceptive conduct or suppression of material facts results in active concealment." *Munjal v. Baird & Warner, Inc.*, 485 N.E.2d 855, 862-63 (Ill. App. Ct. 1985), *overruled on other grounds by Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801 (Ill. 2005); *see also Mitchell v. Norman James Constr. Co.*, 684 N.E.2d 872, 883 (Ill. App. Ct. 1997). Moreover, the plaintiff must come forward with "specific, objective manifestations of fraudulent intent." *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992).

The Seventh Circuit has likewise noted that promissory fraud actions face high hurdles to deter round-about breach of contract actions:

> Promissory fraud is generally not actionable in Illinois, but there is an exception to this rule "where the false promise or representation of intention of future conduct is the scheme or device to accomplish the fraud." *Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977). This exception is broad, and has even been viewed as swallowing the rule barring promissory fraud actions. *Vance Pearson, Inc. v. Alexander,* 86 Ill.App.3d 1105, 42 Ill.Dec. 204, 209, 408 N.E.2d 782, 787 (1980). The scheme exception applies where "a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment." *Concord Industries, Inc. v. Marvel Industries Corp.,* 122 Ill.App.3d 845, 78 Ill.Dec. 898, 901, 462 N.E.2d 1252, 1255 (1984); *see also Price v. Highland Community Bank,* 722 F.Supp. 454, 460 (N.D. Ill. 1989) (Posner, J.) ("[I]f the intention behind the intentionally false promise *1012 is to induce the promisee to act for the promisor's benefit, the promise is actionable.")

*Bower v. Jones*, 978 F.2d 1004, 1011-12 (7th Cir. 1992). The court has subsequently explained that to recover, the plaintiff must show a "pattern of fraudulent acts," and not

8

just the breaking of a "single promise." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999).

**B.     Count I**

In count I, Faust alleges that the "scheme or device" inducing it to enter into the Machinery Contract consisted of MAN Roland's misrepresentation that the Press would satisfy the performance specifications in Addendum A and its misrepresentation that the Press would be "New," combined with fraudulent acts to conceal the true age of the Press. The court addresses each alleged misrepresentation in turn.

   1.     <u>Performance guarantees</u>

MAN Roland argues that Faust's claim that MAN Roland fraudulently misrepresented the capabilities of the Press is foreclosed by the admission of Faust's expert Lewis that a series 722 press generally could satisfy the performance criteria set forth in Addendum A. (*See* Mem. 6-10.) MAN Roland is correct that the proper question is whether, at the time the parties executed the Machinery Contract, the Press *could have* satisfied the specifications,[5] and not whether it eventually *did*. (*See* Reply 3.) Whether the Press eventually did satisfy the performance specifications, without any evidence of MAN Roland's knowledge or intent, is a question of performance under the Machinery Contract, and not a question of fraud in the inducement. But MAN Roland's examination of Lewis did not focus on the Press specifically, but instead focused on series 722 presses generally. In this sense, Lewis's admissions about the series 722 presses' capabilities are relevant only insofar as the Press resembles other series 722

---

[5]     Whether the Press could satisfy the performance specifications of the Machinery Contract concerns the falsity of MAN Roland's representation. MAN Roland's knowledge or belief about the falsity of that representation, and its intent to defraud Faust, are separate issues.

9

presses. In other words, if the Press were a lemon before delivery and MAN Roland knew it, Lewis's admissions would not be probative.

But Faust has not pointed to any evidence that the Press could not satisfy the performance specifications at the time the parties executed the Machinery Contract. Faust has only produced evidence that MAN Roland's representation *later* proved to be false without any evidence of either the shortcomings of the Press at the time of contracting or MAN Roland's knowledge, belief or fraudulent intentions. If after-the-fact falsity were sufficient to prove the fraudulent nature of MAN Roland's earlier promise, the distinction between breach of contract and fraudulent inducement, which the Seventh Circuit and Illinois law recognizes is important, would cease to exist. *See Bower*, 978 F.2d at 1012.

In addition to its evidence that the Press did not satisfy the performance specifications, Faust points to substantial evidence that the series 722 Press that it actually received did not have the upgrades that the series 727 press (which Faust contends it should have received) had. But Faust does not explain how these upgrades relate to Addendum A's performance specifications. These performance specifications might have been satisfied by any number of series 700 presses, as Lewis's testimony bears out. That being so, MAN Roland's upgrades on an already-sufficient series 700 press are irrelevant to determining whether the press could satisfy the requisite performance criteria.

Because Faust has failed to adduce any evidence that MAN Roland's inducement was indeed fraudulent, defendants' motion for summary judgment is granted with respect to allegations regarding the Machinery Contract's performance specifications.

### 2. The "New" Press

MAN Roland next contends it is entitled to summary judgment on Faust's claim that it was fraudulently induced by MAN Roland's assurance that the Press would be "New." MAN Roland's argument is two-fold. First, MAN Roland urges that Faust's claim regarding the "New" press cannot stand without another broken promise to form a fraudulent "scheme or device." *See id.* MAN Roland relies on the following excerpt from the Seventh Circuit's discussion of fraudulent inducement:

> This threat to the competitive process is blocked by the principle of Illinois law that promissory fraud is not actionable unless it is part of a scheme to defraud, that is, unless it is one element of a pattern of fraudulent acts. [Citing cases.] By requiring that the plaintiff show a pattern, by thus not letting him rest on proving a single promise, the law reduces the likelihood of a spurious suit; for a series of unfulfilled promises is better (though of course not conclusive) evidence of fraud than a single unfulfilled promise.

*Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999). The quoted opinion states that a "single unfulfilled promise" is insufficient, but does not state that the plaintiff must produce evidence of multiple unfulfilled promises. *See generally id.* Rather, the opinion makes clear that the plaintiff must allege (and, at this stage, show a genuine issue of material fact) that a "pattern of fraudulent acts" exists. *Id.* This pattern could consist of fraudulent acts, broken promises, or some combination of the two, provided the other elements of fraudulent inducement were met.

Faust has alleged and produced evidence that MAN Roland engaged in a pattern of fraudulent acts with respect to its provision of a "New" press. First, there is evidence that the plate containing the Press's date of manufacture and the serial number was altered to make it appear as though the Press bore the date 1998, and not 1996. (*See generally* Pls.' Stmt. of Add'l Facts ¶ 25 & Exs. E, O, P.) Evidence of this fraudulent act,

11

taken with the genuine issue of material fact that exists regarding whether the 1996-manufactured 722 Press was "New,"[6] is sufficient to establish a pattern of fraudulent acts.

MAN Roland's second argument is that even if it fraudulently induced Faust to enter into the Machinery Contract with the promise of a "New" Press, there is no evidence that Faust suffered damages because there is no difference in value between the series 722 Press actually delivered and the series 727 press to which Faust claims it was entitled. Faust responds that the "improvements, modifications and upgrades made" between the series 722 Press and the series 727 presses are evidence of the difference in value. (Resp. 8.) Those changes are just that–evidence of change–and are not evidence of a difference in value between the delivered and expected presses. Change may translate to increased value, or may not, but Faust has produced no evidence by which the trier of fact could find any increased value. The court therefore grants defendants' motion insofar as Faust seeks to recover for any direct damages from the provision of the Press as opposed to a 727 press.[7]

Without any evidence of the difference in value between the actual and expected presses, Faust claims that it suffered consequential and incidental damages resulting from "the loss of customers, materials, production time, and revenues." (*Id.*) The court previously addressed this issue from a legal standpoint, noting that Illinois allows recovery of consequential and incidental damages in fraud actions. (*See* Doc. No. 226, at 3-4.) Here, the issue is whether Faust has produced sufficient evidence that it actually

---

[6] The court previously ruled that there is a genuine issue of material fact as to whether the Press was "New." (*See* Doc. No. 211, at 14-15.)

[7] Faust seeks to rely on MAN Capital's statements in another case regarding the value of 1998-manufactured and 1996-manufactured presses. (*See* Resp. 9.) These statements are unclear and, in any case, insufficient evidence to create a genuine issue of material fact as to the difference between the Press and a series 727 press.

suffered such damages to survive summary judgment; it has done so, producing evidence of lost revenue and customers and other consequential and incidental damages. (*See* Pls.' Stmt. of Add'l Facts ¶¶ 42-44 and documents cited therein.)

In sum, defendants' motion for summary judgment is denied with respect to Faust's allegations that MAN Roland fraudulently induced it to enter into the Machinery Contract with promises of a "New" press, insofar as Faust seeks consequential and incidental damages of which it has produced evidence.

**C.     Count II**

Finally, MAN Roland and MAN Capital argue that the testimony of Faust's leasing expert entitles them to summary judgment on Count II. According to defendants, Faust's leasing expert attested that the "hell or high water clause" obligated Faust to pay regardless of the Press's malfunction. (Mem. 14.) As described in section II.C above, the expert's testimony is not so clear and, in any case, is irrelevant.

In the previous summary judgment opinion, the court noted that the "hell or high water clause" was preceded by language that rendered the clause ambiguous; the court also noted, "The question of whether a contract is ambiguous is entirely a matter of law to be determined by the court." (*See* Doc. No. 211, at 11 (citing *Lenzi v. Morkin*, 452 N.E.2d 667, 669 (Ill. App. Ct. 1983).) The testimony of Faust's expert does not change the court's role as the arbiter of ambiguity, nor does it alter the ambiguity in the Master Lease Agreement that the court noted in its previous opinion. While fact witnesses may have resolved an ambiguity, an expert witness, with no knowledge of the individual meaning to be given to an otherwise ambiguous clause, offers no such resolution. Therefore, defendants' motion for summary judgment on Count II is denied.

## V. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in part.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: December 23, 2009